1 | Todd D. Carpenter (CA 234464)
  |     tcarpenter@carlsonlynch.com
2 | Brittany C. Casola (CA 306561)
  |     bcasola@carlsonlynch.com
3 | **CARLSON LYNCH SWEET**
  | **KILPELA & CARPENTER, LLP**
4 | 1350 Columbia Street, Suite 603
  | San Diego, California 92101
5 | Telephone: (619) 762-1900
  | Facsimile: (619) 756-6991

*Attorneys for Plaintiffs and the Classes*
*Additional Attorneys in Signature Block*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY GENNOCK and RANDY NUNEZ, individually and on behalf of all others similarly situated, | Case No: 3:18-CV-01891 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| FACEBOOK, INC. and CAMBRIDGE ANALYTICA, | |
| Defendants. | |

- 1 -

CLASS ACTION COMPLAINT

Plaintiffs Ashley Gennock and Randy Nunez, by and through their attorneys, bring this class action against Facebook, Inc. ("Facebook") and Cambridge Analytica ("Cambridge" and, collectively with Facebook, "Defendants"), individually and on behalf of all others similarly situated, and allege as follows:

1. This class action lawsuit is filed to redress an egregious and unprecedented breach of trust and invasion of privacy by which Facebook permitted Cambridge to intentionally and secretly mine the personal data of more than 50 million Facebook users in order to create psychological profiles on users and use those profiles to target individuals with "psychological operations" intended to influence their conduct.

2. Plaintiffs seek redress for Defendants' wrongful acts both individually and on behalf of all Facebook users whose personal information was acquired by Cambridge, without the users' authorization or by exceeding its authorization, as described in more detail below.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises in part under a federal statute, namely the Stored Communications Act, 18 U.S.C. § 2701, et. seq. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

4. In addition to federal question jurisdiction, this Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d) under the Class Action Fairness Act, because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the class is a citizen of a different state from any defendant

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in and are subject to personal jurisdiction in this District. Venue is also proper in this District because it is the District in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

# PARTIES

6. Plaintiff Ashley Gennock resides in Pennsylvania. Ms. Gennock joined Facebook in or around June 2009.

7. Plaintiff Randy Nunez resides in California. Mr. Nunez joined Facebook in or around July 2008.

8. Defendant Facebook, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California. Facebook operates a social networking website for the purpose of allowing people to interact and communicate with their family, friends, and coworkers.

9. Defendant Cambridge Analytica is a Delaware limited liability company with offices in London, New York, and Washington, D.C. Cambridge does business throughout the United States.

## COMMON FACTUAL ALLEGATION

**A. Facebook's Promise to Users of its Social Media Platform**

10. Plaintiffs and class members are users of Facebook's social media platform, which has more than two billion users.

11. To its users, Facebook provides an assurance of privacy and the ability for users to control what information is transmitted to third parties.

12. Indeed, Facebook emphasized trust to its users and informed its users that their information would not be sold or transferred to any ad network, data broker, or other advertising or other monetization-related servicers.

13. Facebook also assured its users that their personal information would not be shared without their explicit consent.

14. But Facebook's interface, called "Graph API," which allowed third parties to interact with the Facebook platform, was overly permissive and, contrary to Facebook's assertions to its users, permitted developers to gain unrestricted access to a wealth of personal information about Facebook users without their consent.

15. A former manager at Facebook recently informed the news media that Facebook was aware of its lax approach to data protection because that manager had warned senior executives at the company that there was a risk of a major breach, but the senior executives chose to ignore those warnings.[1]

16. A representative from Data & Society, a research institute, confirmed that "these problems [with data security] were pointed out to [Facebook] by scholars years ago."[2]

**B. How Cambridge Began**

17. In 2013, Alexander Nix was the leader of the special elections division of SCL Group, a public relations firm that describes its capabilities as "psychological warfare" and "influence operations."

18. A meeting between Mr. Nix and Steve Bannon (the former executive chairman of Brietbart News) led to the involvement of Robert Mercer (a hedge-fund tycoon) in a scheme to use personality profiling to influence behavior.

19. With that intent, Mr. Mercer and SCL Group began Cambridge as a joint venture, financed with a $15 million investment by Mr. Mercer.

20. Christopher Wylie was a data expert who helped start Cambridge and oversaw the conduct complained of herein, and, as will be described below, was ultimately the whistleblower who eventually made Defendants' secret wrongdoings public.

21. According to Mr. Wylie, Messrs. Bannon and Mercer wanted to fight a culture war in the US and "Cambridge Analytica was supposed to be the arsenal of weapons to fight that culture war."[3]

---

[1] https://www.theguardian.com/technology/2018/mar/24/cambridge-analytica-week-that-shattered-facebook-privacy
[2] https://www.theguardian.com/technology/2018/mar/24/cambridge-analytica-week-that-shattered-facebook-privacy
[3] https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html

22. But Mr. Wylie also realized that Cambridge did not have enough data to deliver the results that Messrs. Bannon and Mercer were seeking.

**C. Millions of Facebook Users' Personal Information is Harvested by Cambridge**

23. Mr. Wylie found that Cambridge University Psychometrics Center researchers had developed a technique to map personality traits based on what people on Facebook liked by paying small sums for Facebook users to download an application ("app") and take a personality quiz.

24. The app would scrape private information from the user's profile.

25. Cambridge University Psychometrics Center, however, declined to work with Cambridge.

26. But Mr. Wylie solicited Dr. Aleksandr Kogan, who was then a psychology professor at Cambridge University.

27. Dr. Kogan was able to build his own app to use through Facebook, which was key to Cambridge gathering the quantity and quality of data needed to create the psychological profiles Cambridge desired.

28. By June 2014, Cambridge had paid over $800,000 for Dr. Kogan to begin harvesting Facebook user data and transmit it to Cambridge.

29. Dr. Kogan, by and through his company Global Science Research, created "*ThisIsYourDigitalLife*," which was a personality quiz that required Facebook users to download an app (the "YDL App") to take the quiz.

30. Posing as an academic researcher, Cambridge identified Facebook users on Amazon's "Mechanical Turk" and Qaultric – online survey platforms – and offered to pay them to download and use the YDL App, which was identified as "a research tool used by psychologists."

31. Cambridge paid Facebook users to download the YDL App and take the personality quiz. In order to receive the payment, Cambridge required the users to log in to the YDL App through the Facebook account credentials.

32. The approximate 270,000 Facebook users that downloaded the YDL App were required to provide permission for the app (and thereby, Cambridge) to access personal information such as that user's profile, friend networks, "likes," and user location.

33. But Cambridge was not performing academic research and did not only want the answers to the YDL App's personality quiz. What it wanted, and what it received by virtue of using Facebook's Graph API, was access to the personal information of each quiz taker and *all* of that user's Facebook friends' personal information.

34. The YLD App obtained absolutely no permission from its users' Facebook friends to harvest their personal data.

35. On average, each "seeder" or direct user of the YLD App, unwittingly gave access to a minimum of 160 other Facebook user's profiles and personal information.

36. The whistleblower, Mr. Wylie, confirms that there are receipts, invoices, emails, and letters that show how Cambridge harvested the profiles of ***more than 50,000,000 Facebook users*** between June and August 2014.[4]

37. The mass data collection was not only allowed, but encouraged by Facebook, which sought to encourage developers to build on its platform, which, upon information and belief, financially benefitted Facebook.

**D. Facebook Learns of the Privacy Breach**

38. Mr. Wylie confirms that Facebook would have known that the breach was occurring at the time; its security protocols would be triggered because the YDL App was pulling an enormous amount of data from Facebook.[5]

---

[4] https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump

[5] https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump

- 6 -
CLASS ACTION COMPLAINT

39. By the end of 2015, Facebook was notified that the data extracted by the YDL App had been transmitted to Cambridge, but Facebook choose not to notify its users and took no action for months.

40. In mid-2016, Facebook merely wrote to Cambridge that the data could not be used in the future and asked Cambridge to delete the data immediately.

41. Facebook made zero effort to get the data back; moreover, Cambridge did not delete the data.

**E. Cambridge Uses the Personal Data of 50 Million Facebook Users to Create Psychological Profiles on Americans**

42. With the harvested Facebook data including data points about individual's interests, activities, opinions, and motivations, Cambridge was able to create psychological profiles on millions of Americans.

43. These profiles were used by Cambridge to make predictions about people's behaviors and to create predictions about what people will do and what motivates them.

44. With these profiles and predictions, Cambridge deployed "psychological operations" – a method of information dominance using targeted advertisements in an effort to influence people's views and choices by playing to their preferences.

45. According to Mr. Wylie, Cambridge's psychological operations were "built on the back of that [harvested Facebook] data. The models, the algorithm. Everything."[6]

46. As a result of Defendants' conduct, not only was the personal information of millions of Facebook users stolen, but that stolen data was then used in Cambridge's psychological operations targeting those individuals.

**F. Defendants' Wrongdoing is Discovered**

47. Plaintiffs and the class members were not aware that Defendants' had stolen their personal information and used it against them.

---

[6] https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump

48. On March 17, 2018, for the first time, Defendants actions came to light.

49. *The Guardian* published an article, based on information obtained from, *inter alia*, Mr. Wylie, which detailed Cambridge's unauthorized mining of 50,000,000 Facebook users' data and its employment of that data to target individuals with its psychological operations to influence their views regarding the 2016 Presidential Election.[7]

### G. Plaintiffs' Experience

50. Plaintiff Ashley Gennock does not recall downloading the YDL App.

51. Ms. Gennock currently has over 3,200 Facebook "friends."

52. Ms. Gennock recalls viewing political ads through her Facebook account leading up to the 2016 Presidential Election.

53. Plaintiff Randy Nunez does not recall downloading the YDL App.

54. Mr. Nunez currently has over 1,000 Facebook "friends."

55. Mr. Nunez recalls viewing political ads through his Facebook account leading up to the 2016 Presidential Election.

56. Plaintiffs and class members were harmed by the misconduct of Defendants.

57. Plaintiffs and class members had their personal information harvested from their Facebook profiles by Cambridge through use of the YDL App, either directly as a user of the app, or indirectly as a Facebook "friend" of a user of the app.

58. Plaintiffs and class members did not consent for the YLD App to have access to their personal information or else consented only for their information to be accessed for academic purposes.

59. Plaintiffs and class members were harmed by Cambridge unlawfully obtaining their personal information, using their personal information to psychologically profile them, and Cambridge directing its psychological operations at them in an effort to influence their views about, *inter alia*, the 2016 Presidential Election.

---

[7] https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump

## CLASS ACTION ALLEGATIONS

60.  Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs, individually and on behalf of all others similarly situated, bring this action on behalf of themselves and the following classes of individuals:

> CLASS: All Facebook users in the United States whose personal information was acquired by Cambridge through use of the YDL App.
>
> CALIFORNIA SUBCLASS:  All Facebook users in California whose personal information was acquired by Cambridge through use of the YDL App.
>
> PENNSYLVANIA SUBCLASS:  All Facebook users in Pennsylvania whose personal information was acquired by Cambridge through use of the YDL App.

61.  Excluded from the class and subclasses are Defendants and any entities in which any Defendant or their subsidiaries or affiliates have a controlling interest, and Defendants' officers, agents, and employees.  Also excluded from the class and subclasses are any attorneys who enter their appearance in this case as well as the judge assigned to this action and any member of his or her immediate family.

62.  **Numerosity**:  The class described above is so numerous that joinder of all members is impracticable.  It is estimated that 50,000,000 Facebook users' personal information was harvested in the actions complained of in this Complaint.  The disposition of the individual claims of the respective class members will benefit the parties and the Court and will facilitate judicial economy.

63.  **Ascertainability**:  The class members are ascertainable through records kept by Defendants.

64.  **Typicality**:  Plaintiffs' claims are typical of the members of the class.  The claims of each class member arises from the same course of uniform misconduct by Defendants.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and the class members based on the same operative facts.

65. **Existence of Predominance of Common Questions of Law and Fact**: This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common questions include, but are not limited to, the following:

  a. Whether Plaintiffs and class members' personal information was obtained by Cambridge;

  b. Whether Cambridge improperly obtained Plaintiffs' and class members' personal information without authorization or by exceeding its authorization;

  c. Whether Facebook represented that Plaintiffs' and class members' personal information would be protected from disclosure absent their consent;

  d. Whether Facebook's data security measures were lax and exposed Plaintiffs and class members to the egregious breach of privacy and trust alleged in the Complaint;

  e. Whether the egregious breach of privacy and trust alleged in the Complaint was foreseeable by Facebook;

  f. Whether Facebook intentionally exposed Plaintiffs' and class members' personal information to Cambridge;

  g. Whether Defendants violated the Stored Communications Act;

  h. Whether Defendants violated Plaintiffs' and class members' privacy rights; and

  i. Whether Plaintiffs and class members are entitled to actual, statutory, or other forms of damages.

66. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by this action and similar or identical questions of statutory and common law, as well as similar or identical injuries, are involved. Individual

questions, if any, pale by comparison to the numerous common questions that dominate this action.

67. **Adequacy of Representation**: Plaintiffs are adequate representatives of the class because their interests do not conflict with the interest of the class members. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class members and Plaintiffs have no interests antagonistic to the class members. Plaintiffs have retained counsel who are competent and experienced in class action litigation, and who possess specific expertise in privacy and data breach litigation.

68. **Superiority**: The nature of this action and the nature of the laws available to Plaintiffs and the class make the use of the class action format a particularly efficient and appropriate procedure to afford relief for themselves and the class for the wrongs alleged. The damages and/or harm suffered by individual class members is relatively modest compared to the burden and expense that individual litigation of their claims against Defendants would entail. It would thus be virtually impossible for Plaintiffs and class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent class litigation, class members and the general public would likely not recover, or would not likely have the chance to recover for the damages and/or harm caused to them.

## COUNT I
### Violation of the Stored Communications Act, 18 U.S.C. § 2701, et. seq.
### Plaintiffs v. Defendants

69. The allegations in the previous paragraphs are incorporated herein by reference.

70. The Stored Communications Act ("SCA") provides a cause of action against any "person" who "intentionally accesses without authorization a facility through which an electronic communication service is provided," "or who intentionally exceeds authorization to access that facility; and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in electronic storage in such a system." 18 U.S.C. § 2701(a).

71. The SCA also provides a cause of action against an entity providing an electronic communication service for "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

72. The statute defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

73. The SCA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

74. The SCA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

75. Congress passed the SCA as part of the Electronic Communications Privacy Act of 1986 ("ECPA").[8] As the titles suggest, the primary purpose of these laws was to bolster privacy protections for emerging forms of electronic communication.

76. The Senate Report on the ECPA and SCA acknowledged that a combination of constitutional provisions, case law, and statutes afforded high levels of protection against interception to letters sent through the mail and voice communications transmitted via common carriers.[9]

77. By contrast, in 1986 there were "no comparable Federal statutory standards to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications and computer

---

[8] Pub. L. No. 99-508, 100 Stat. 1848 (1986) (codified as amended at 18 U.S.C. § 2510 *et seq.*)

[9] S. Rep. No. 99-541, at 5, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3359.

technology."[10] The Senate report found that this gap resulted in legal uncertainty, discouraged the use of innovative systems, and "probably encourages unauthorized users to obtain access to communications to which they are not a party."[11]

78. Therefore the purpose of the ECPA and the SCA was to fill this gap; "to protect the privacy of our citizens," while maintaining "a fair balance between the privacy expectations of American citizens and the legitimate needs of law enforcement agencies."[12]

79. Facebook is an electronic communications service provider within the meaning of the SCA.

80. Facebook and Cambridge are persons within the meaning of the SCA.

81. Cambridge intentionally accessed without authorization or intentionally exceeded authorized access to facilities through which electronic communication systems were provided when it used the YDL App to steal millions of Facebook users' personal information without their consent.

82. Facebook intentionally exceeded its authorized access and thereby altered authorized access when it, through Graph API, transmitted millions of Facebook users' personal information to the YLD App without the users' consent.

83. Facebook also knowingly divulged to Cambridge, through Graph API, the contents of tens of millions of its users' communications while in electronic storage by Facebooks service.

84. Plaintiffs and class members are aggrieved persons under 18 U.S.C. § 2707(a) because Defendants accessed their personal information and communications without

---

[10] *Id.*
[11] *Id.*
[12] *Id.*; *see also id.* at 3 (explaining that the specific purpose of the SCA is to address "access to stored wire and electronic communications and transactional records" and to "protect privacy interests in personal and proprietary information, while protecting the Government's legitimate law enforcement needs.").

Plaintiffs' or class members' knowledge or consent, or in excess of any authorization given to Defendants by Plaintiffs and class members.

85. Defendants' violations caused Plaintiffs and class members concrete and particularized harm because Plaintiffs' and the class members' personal privacy was invaded.

86. Under 18 U.S.C. § 2707(b) and (c), Plaintiffs and class members are entitled to equitable or declaratory relief as may be appropriate, actual damages or statutory damages of $1,000 whichever is higher, costs and attorneys' fees.

87. Additionally, because Defendants violations were willful and/or intentional, Plaintiffs and class members are entitled to punitive damages under 18 U.S.C. § 2707(c).

**COUNT II**
**Invasion of Privacy by Intrusion**
**Plaintiffs v. Facebook**
**Randy Nunez v. Cambridge Analytica**

88. The allegations in the previous paragraphs are incorporated herein by reference.

89. The California Constitution *expressly* provides for a right to privacy: "*All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, **and privacy**.*" *California Constitution, Article 1, Section 1 (emphasis added).*

90. California common law, likewise, recognizes the tort of invasion of privacy.

91. Plaintiffs bring this claim individually and on behalf of all class members in the United States against Facebook pursuant to Facebook's terms and conditions, which designates California law as the sole applicable law governing the relationship between Facebook and its users.

92. Plaintiff Randy Nunez also brings this claim against Cambridge, individually and on behalf of the California subclass.

93. Facebook's terms of use in effect during the matters complained of herein provided, *inter alia*, that user's personal information would not be released to third-parties without the user's consent.

94. Facebook's users reasonably believed that they could interact with their family, friends, and coworkers through Facebook's social media platform without their personal information being stolen by third-parties.

95. Plaintiffs and class members had an interest in precluding the dissemination and/or misuse of their personal information and in conducting their personal activities without intrusion or interference, including the right to not have their personal information stolen and used against them in psychological operations.

96. Defendants intentionally intruded on Plaintiffs' and class members' private life, seclusion, or solitude, without consent.

97. Defendants' conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the privacy right.

98. Plaintiffs and class members were harmed by Defendants' wrongful conduct.

**COUNT III**
**Invasion of Privacy – Intrusion Upon Seclusion**
**Gennock v. Cambridge Analytica**

99. The allegations in the previous paragraphs are incorporated herein by reference.

100. Pennsylvania common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in multiple sections of the Pennsylvania constitution.

101. Plaintiff Gennock brings this claim against Cambridge, individually and on behalf of the Pennsylvania subclass.

102. Facebook's terms of use in effect during the matters complained of herein provided, *inter alia*, that user's personal information would not be released to third-parties without the user's consent.

103. Facebook's users reasonably believed that they could interact with their family, friends, and coworkers through Facebook's social media platform without their personal information being stolen by third-parties.

104. Plaintiffs and class members had an interest in precluding the dissemination and/or misuse of their personal information and in conducting their personal activities without intrusion or interference, including the right to not have their personal information stolen and used against them as psychological operations.

105. Cambridge intentionally intruded on Plaintiffs' and class members' private life, seclusion, or solitude, without consent.

106. Cambridge's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the privacy right.

107. Plaintiffs and class members were harmed by Cambridge's wrongful conduct.

**PRAYER FOR RELIEF**

108. Wherefore, Plaintiffs, on behalf of themselves and the other members of the class, requests that this Honorable Court award relief in their favor and against Defendants as follows:

   a. Certifying the classes and designating the named Plaintiffs as the class representatives and their counsel as class counsel;
   b. Declaring Defendants' conduct unlawful and enjoining the conduct described herein;
   c. Awarding Plaintiffs and the proposed class members actual, statutory, and punitive damages;
   d. Awarding attorneys' fees and costs; and
   e. Such other relief as the Court may deem just, necessary, or appropriate.

///
///
///

# JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Date: March 27, 2018                                     Respectfully submitted,


*/s/ Todd D. Carpenter*
Todd D. Carpenter (CA 234464)
  tcarpenter@carlsonlynch.com
Brittany C. Casola (CA 306561)
  bcasola@carlsonlynch.com
**CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP**
1350 Columbia Street, Suite 603
San Diego, California 92101
Telephone: (619) 762-1900
Facsimile: (619) 756-6991
tcarpenter@carlsonlynch.com

Gary F. Lynch (*Pro Hac Vice to be Filed*)
  glynch@carlsonlynch.com
Kelly K. Iverson (*Pro Hac Vice to be Filed*)
  kiverson@carlsonlynch.com
**CARLSON LYNCH SWEET KILPELA & CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246

Karen Hanson Riebel (*Pro Hac Vice to be Filed*)
  khriebel@locklaw.com
Katie M. Baxter-Kauf (*Pro Hac Vice to be Filed*)
  Kmbaxter-kauf@locklaw.com
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401-2159
Telephone (612) 339-6900

Arthur M. Murray (*Pro Hac Vice to be Filed*)
  amurray@murray-lawfirm.com
Caroline W. Thomas (*Pro Hac Vice to be Filed*)
  CThomas@murray-lawfirm.com

**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Facsimile: (504) 584-5249

Kenneth W. DeJean (*Pro Hac Vice to be Filed*)
   kwdejean@kwdejean.com
Adam R. Credeur (*Pro Hac Vice to be Filed*)
   adam@kwdejean.com
**LAW OFFICES OF KENNETH W. DEJEAN**
417 W. University Avenue (70506)
Post Office Box 4325
Lafayette, LA 70502
Phone (337) 235-5294
Facsimile (337)235-1095

*Attorneys for Plaintiffs and the Classes*